## MICHAEL MULRY *v.* JOHN L. C. NORTON et al.

*Accretion — doctrine of, only applicable where the increase is made by imperceptible degrees — an owner of a beach does not lose his title thereto, by its sudden overflow by the ocean — when a court of equity will restrain a trespass upon land.*

The plaintiff claimed to be the owner of a portion of the ocean beach at Far Rockaway, in the town of Jamaica, Long Island. The southerly or ocean line of the beach is now just where it was in 1797 when the land was conveyed to the plaintiff's grantors. About four miles to the east of the plaintiff's land is an island called Long Beach, which belongs to the town of Hempstead. Prior to 1835 Long Beach was bounded on the west by an inlet connecting the waters of Hempstead bay with the ocean. Between 1835 and 1869 the action of the tides and storms caused the inlet to move constantly to the west. As it moved the beach was first washed away, then shoals formed where the beach previously was, and finally those shoals became a bar and solid beach and attached themselves to the island. In the course of these changes the plaintiff's land was overflowed and his beach washed away. Subsequently it arose again from the sea, separated from the main land by the channel of the inlet. Thereafter, as the result of some violent disturbance of the sea, the waters broke through to the east of the plaintiff's land, at the place where the inlet originally existed, and at the same time the inlet to the west of the place shoaled and filled up and the outer beach became attached to the main land at a point to the west of the plaintiff's land, leaving the beach in front of his land separated from it by water. The shiftings of the channel were frequent and sudden, varying from 300 yards to half a mile in a single storm or in a single night.

*Held,* that the owners of Long Beach did not acquire title in the islands and beaches added to it by the shifting of the inlet, as such accretions did not occur little by little, or by small and imperceptible degrees.

That the sudden overflowing and submergence of the plaintiff's beach by the ocean did not deprive him of his title thereto or vest the same in the State, and that he was entitled to claim and possess the beach upon its subsequent reappearance.

The complaint in this action alleged the ownership of the beach by the plaintiff; that it was a necessary appurtenance to a hotel which had been erected on the main land, and that he had leased it for bathing purposes with covenants of peaceable possession. It also alleged that the defendants intended to take possession thereof by virtue of a lease given to them by the owners of Long Beach which lease was alleged to be invalid It prayed that the lease be declared void and the defendants be restrained from taking possession of the beach on the grounds that the lease was a cloud upon plaintiff's title, and that if the defendants took possession of the beach the business of the plaintiff's tenants would be destroyed and his hotel irreparably injured.

*Held*, that a case was stated calling for the interference of a court of equity.

APPEAL from a judgment in favor of the plaintiff, entered upon the trial of this action by the court without a jury.

BROWN, J.:

The plaintiff claims to be owner of a portion of the ocean beach at Far Rockaway, Long Island.

The complaint alleges that plaintiff keeps a hotel at Far Rockaway, and that the beach is a necessary appurtenant to the hotel, and has been leased by him for bathing purposes with covenants of peaceable possession.

That the defendants hold a lease from the town of Hempstead, and that it is their intention to take possession under said lease. That the town of Hempstead has no title to the lands, and that the lease is a cloud upon plaintiff's title, and if the defendants obtained possession the business of plaintiff's tenants would be destroyed and his hotel irreparably injured.

The relief sought was, that the lease from the town of Hempstead should be declared void and be decreed to be canceled, and that the defendants be enjoined from taking possession of said lands. The defendant Norton answered that the town of Hempstead owned the beach, and that the lease in question was valid, and denied plaintiff's title.

The trial court found the title and possession to be in the plaintiff; and judgment was rendered restraining the defendants from taking possession of said beach lands, and declaring said lease, so

far as it related to plaintiff's lands, to be void. The premises were conveyed to the plaintiff in 1872, and are described in the deed to plaintiff, as well as in all *mesne* conveyances as bounded by the Atlantic ocean. As far back as 1797, the southerly boundary of the beach was just where the present ocean line is. About four miles to the east of the plaintiff's land is an island called Long Beach, which is the property of the town of Hempstead.

Prior to 1835, Long Beach was bounded on the west by Brockleface Gut, or East Rockaway Inlet, an inlet which connected the waters of Hempstead Bay with the ocean. Between 1835 and 1869 the west point of Long Beach extended into the ocean about four miles to the west. This was done by additions on its west end. From the action of the tides and storms the inlet aforesaid was constantly changing to the west. As it advanced the main land or shore was in the first instance washed away; then shoals formed where the beach previously existed, the shoals then became a bar and the bar finally solid beach.

In the progress of these constant changes the beach in front of plaintiff's lands was washed away and the land overflowed, the inlet moved from one place to another and finally moved to a point west of plaintiff's lands, and the beach in question arose from the sea, separated from plaintiff's main property by the channel of the inlet; then, as the result of some other violent disturbance of the sea, the waters of the ocean broke through to the east of plaintiff's lands at the point where the inlet originally had existed; the inlet to the west shoaled and filled up, and the outer beach became attached to the main shore at a point west of plaintiff's lands, thus inclosing the waters which were between the main shore and the outer beach, so that the waters now flow between the property upon which the hotel stands and the premises which are the subject of this action.

The defendants' contention is, that Long Beach has extended and grown by accretion across the plaintiff's premises, and has carried the title to the lands in dispute to the town of Hempstead, as the owner of Long Beach.

The trial court refused to find that the addition made to Long Beach constituted accretion, and the exception to such refusal raises one of the principal questions presented upon this appeal.

*Accretion* is defined to be *an increase by imperceptible degrees.*

(*Rex* v. *Lord Yarborough*, 3 B. & Cress., 91; *Scratton* v. *Brown*, 4 id., 485; *Emans* v. *Turnbull*, 2 Johns., 322; Bacon's Abridgment, Title Prerogative [vol. 5], p. 500.)

"The *jus alluvionis*, which is an increase of the land adjoining, by the projection of the sea casting up and adding sand and slubb to the adjoining land, whereby it is increased for the most part *by insensible degrees*. (Hale's De Jure Maris, p. 25.)

"As to lands gained from the sea by alluvion, the law is held to be that if this gain be *by little and little, by small and imperceptible degrees*, it shall go to the owner of the land adjoining. (2 Blackstone's Commentaries, p. 61; Angel on Tide Waters, p. 249, etc.)

We do not think the facts of this case present a case of accretion. Long Beach did not grow "*little by little*" or by "*slow and imperceptible degrees*," but in part at least by the additions to it of shoals or small islands which had formed west of it, and separately, and which were separated from each other and from Long Beach by wide and deep channels of water. These channels became filled up by the action of the tides and currents of the ocean, and the shoals were thus united and joined together and all of them became united to Long Beach. It was the shifting from time to time of the main inlet which caused the changes which occurred in the shore. This shifting of the inlet was frequent and sudden. One witness says that it shifted from three hundred yards to one-half a mile in a single storm; another, that it changed half a mile in a night; another that two or three hundred yards were added to the westerly end of the beach as the result of a single storm.

Such a process is not accretion, and in our judgment would not have sustained a finding that the land thus united to Long Beach became the property of the owners of that island. Title by accretion cannot be based upon such sudden convulsions of nature, as the evidence shows were continually happening along this shore for the past quarter of a century.

Another serious difficulty in the defendant's contention is the position of Coots bar. This bar extended from the mainland south a considerable distance on the west of Rockaway inlet and directly in the line of the extension of Long Beach. To the north of the bar was a bay or estuary, 600 to 900 feet wide, which extended to the west a distance of nearly a mile.

This bar was originally granted by the town of Hempstead to Jacob Hicks and the title is now in one Lawrence.

The defendant contends that the bar disappeared altogether as the inlet changed, while the plaintiff claims that the inlet broke through to the west end of the estuary, leaving the bar south of the new inlet. The trial court refused to find that the bar disappeared, and we cannot say that the refusal to so find is not supported by the testimony.

Assuming that it did not disappear, it became joined to Long Beach, and it is very plain that the town of Hempstead could not claim title either to the bar or to any accretion to the west of it. Owned by Lawrence, it stands an insurmountable obstacle between Hempstead's lands and the new beach to the west.

. It is claimed by the defendant, however, that the town of Hempstead was in possession of the beach in front of plaintiff's lands at the date of the deed to the plaintiff; that the title to the beach, if not in the town of Hempstead, is in the State, and that the plaintiff does not, therefore, make out a case entitling him to the interference of a court of equity in his behalf.

The trial court found that the plaintiff took possession under his deed, and has continued in possession ever since. We think the evidence sustains that finding, and that the plaintiff had such possession as would entitle him to maintain this action against the defendant, even though he may not be vested with the absolute title to the land.

But we find nothing in the testimony which would sustain us in holding that the plaintiff's grantors had lost title to the beach by reason of its overflow or submergence by the sea.

The deeds to plaintiff's grantors bounded the land by the ocean. This carried the title to high-water mark. As late as 1858 (some of the witnesses say) it was all solid beach, and you could walk down to the old high-water mark. The submergence of the beach was subsequent to that date.

The law of accretion applies between the sovereign and subject the same as between subject and subject. When land is overflowed, and the advance of the sea is so slow and gradual that its progress is imperceptible, the sovereign acquires the title to the part of the shore submerged; but where the sea suddenly inundates the land,

the subject retains the title to the land covered with water. (Angel on Tide Waters, 265, 266 ; 2 Blacks. Com., 262; Hale's De Mare Juris, pp. 29, 36, 37.)

The appellant cites *Matter of Hull and Selby Railroad Company* (5 M. & W., 327) as holding a contrary doctrine. The headnote of that case is as follows: " If the sea, or an arm of the sea, by *gradual and imperceptible progress* encroach upon the land of a subject, the land thereby covered with water belongs to the crown;" but the court distinctly recognizes the principle that when the inundation is sudden there is no change in the title of the submerged land.

Lord ABINGER, after stating the principle contained in the headnote, says: "It is different, indeed, where the change occurs by a sudden advance or recession of the water," and then cites a case of sudden overflow in Scotland, in which he says the owner did not lose his right to the soil.

Angel (at page 264) states the rule as follows: "This increase (by reliction) has been known in some parts of the world to occur suddenly and to a very great extent. * * * In such cases the land left dry by the receding of the water is the property of the sovereign as being a part and parcel of what previously was the sovereign *demesne*. *The right of property in the soil, in other words, is not changed by such change of the water.* * * * *The right of the riparian proprietors to their upland which is inundated by an encroachment of the sea and then left dry is still retained.*" The upland owner when land is overflowed may reclaim it from the sea by artificial means.

See 7 Jac., C. & B., per Coke & Foster, cited by Lord HALE, where land was reclaimed from the river Thames which had been inundated for the space of forty years. (See, also, Angel on Tide Waters, 265.) This right to regain the land rests solely on the principle that the title to the submerged lands remains in the riparian owner.

There is nothing in the case of *Trustees* v. *Kirk* (84 N. Y., 215) to conflict with this view. That was not a case of sudden overflow.

Without entering into a discusssion of the testimony we think it clear that the beach in front of plaintiff's property did not wear away by imperceptible degrees. The fact that in about thirty years

over four miles of solid beach washed away and formed again, and that the inlet moved four miles and then returned to its original position, leads to the irresistible conclusion that the process of inundation was not so slow and gradual that one could not perceive how much was overflowed at any one moment of time.

Our conclusion is, therefore, that the State did not gain title to the plaintiff's lands by the overflow of the ocean. The title remained in the original proprietor, and in the absence of any proof to the contrary it is to be presumed that plaintiff's deed conveyed to him the title to the land to original high-water mark.

As the land under water, therefore, belonged to the plaintiff's grantors they remained owners when it reappeared above the sea. "If the soil, when covered by water, belonged to an individual, then, though relicted, it continues to belong to him." (Angel on Tide Waters, 265.)

"When the land, as it stood covered with water, did by particular usage or prescription belong to a subject, then the *recessus maris* so far as the subject's particular interest went while it was covered with water, so far the *recessus maris vel brachii ejusdem* belongs to the same subject." (Hale's De Mare Juris, 29.)

As touching islands arising in the sea, the same rule holds. "Of common right and *prima facie*, it is true they belong to the crown. But where the interest of such *districtus maris*, or arm of the sea, or creek or haven, doth belong to a subject either by charter or prescription, the islands which happen within the precincts of such private propriety of a subject, will belong to the subject." (Angel on Tide Waters, p. 267, 268.)

The trial court found that the beach in question was formed by shoals emerging from the sea, that they varied in length from 300 to 1,200 feet, with navigable channels of water between them, and that such shoals were the basis of the present beach, and these findings are fully sustained by the testimony. Such shoals as they emerged from the sea, within the limits of plaintiff's lands, belonged to plaintiff's grantors, and plaintiff's title to the land in dispute is thus clearly established.

The only remaining question in the case is whether the facts warranted the interference of a court of equity.

An owner of land is entitled to the equitable interference of the

court in his behalf to restrain and prevent an illegal entry thereon, whenever the damages which might be recovered in an action at law would be inadequate to compensate for the injury which would be sustained from the trespass. (Story's Eq. Jur., § 918; *Livingston* v. *Livingston*, 6 Johns. Ch., 497; *Carpenter* v. *Gwynn*, 35 Barb., 395; *West Point Iron Co.* v. *Reymert*, 45 N. Y., 705; *Watson* v. *Sutherland*, 5 Wall., 74.)

The absence of a plain and adequate remedy at law affords the only test of equity jurisdiction.

Legal compensation refers solely to the injury done to the property taken and not to any consequential damages.

In this case it is apparent that the consequence of the threatened trespass would have been very serious to the plaintiff, and one for which an action at law would not have given an adequate remedy, as the injury to plaintiff's business could not be correctly estimated or ascertained.

Under our system of practice the legal right to the property may be established and the equitable remedy afforded in the same action. (*Broiestedt* v. *S. S. R. Co.*, 55 N. Y., 220.)

The remedy by injunction was, therefore, appropriate and fully warranted by the facts of the case.

Upon the whole case we think the decision was right, and the judgment should be affirmed, with costs.

BRADY, J., concurred; BARNARD, P. J., dissented.

Judgment affirmed, with costs.